[S. F. No. 17443.   In Bank.   Aug. 5, 1947.]

LEO PALMTAG, Respondent, v. CARL E. DANIELSON, Appellant.

Nathan Frankel, Sloss & Turner, Sloss & Eliot and Frank H. Sloss for Appellant.

Fitzgerald, Abbott & Beardsley and Franklin C. Stark for Respondent.

TRAYNOR, J.—Plaintiff, a real estate broker, brought this action to recover a commission for the sale of defendant's real property. Defendant sold the property to a buyer procured by plaintiff at a price lower than the figure at which plaintiff was authorized to sell. The trial court entered judgment for plaintiff and defendant appeals.

The question presented on this appeal is whether the agreement between the parties was a general contract merely stating an asking price or a special contract calling for a purchaser willing to pay a net minimum price.

In April, 1943, plaintiff wrote to defendant to procure an agency to sell defendant's property. Defendant had previously attempted to sell this property personally and through brokers for a period of about four years. He replied to plaintiff's request by letter, dated April 29, 1943. The significant passages of the letter are:

"I acknowledge receipt of your letter under date of April 27 with reference to my property at 645 Watkins Street in Hayward. Yes, I am interested in selling my property in Hayward providing that I can get my price. I have had quite a few inquiries as of late; however, I have not tied up with anyone exclusively at this writing.

"The property, as you know, is one of the finest in Hayward. [Here follows an exhaustive description of the property.]

"The only reason that I would care to sell it is because I do have an opportunity to put my money into another invest-

ment that I would like to do. If it wasn't for this, I wouldn't consider selling it at any price. I have a price of $40,000.00 on the property and if you should arrange the sale, I will pay you 5% commission or a net to me of $38,000.00. [Here follow details on taxes and frontage.]

"If there is further information that you require, I would be glad to furnish it to you. I am not overly anxious to sell the property, but, however, as above stated, I would consider a sale."

Upon receipt of this letter, plaintiff immediately reported to defendant that he had discussed the property with a client. The broker informed defendant that "I did not discuss price over the telephone, but I do think there should be only one price on the property, regardless of whether you sell it or we, the price being $40,000.00."

Plaintiff made an active effort to sell defendant's property during and after May, 1943. His prospective purchasers included one Elwood Johnson, the ultimate buyer. Johnson was a partner in an implement business and a competitor of the tenants then occupying defendant's premises. He gave the broker little encouragement until September, 1943, when his company received a notice from its landlord terminating its tenancy. At this time Johnson requested additional information concerning defendant's property, and plaintiff conducted him through the building and grounds. He informed Johnson that a local bank was familiar with the property, and together they had a conference with the banker, who affirmed plaintiff's views concerning the value of the property.

Plaintiff next showed Johnson defendant's letter of April 29th, which stated defendant's terms and price. Johnson was not willing to pay $40,000 and mentioned $35,000 as his top price. Johnson was considering other means of solving his problem at this time, but plaintiff advised the purchase of defendant's property and raised persuasive objections to Johnson's proposed alternatives. On October 4, 1943, Johnson made arrangements for a direct meeting in Sacramento with defendant. He revealed his plans to plaintiff, who requested that defendant be informed of plaintiff's part in interesting Johnson in the property. Plaintiff made certain of defendant's knowing of his efforts by telephoning him.

There is a conflict in the testimony regarding the statements made during this telephone conversation. According to plain-

tiff, he told defendant that he felt he had sold Johnson the property and that Johnson was going to Sacramento to make the purchase. He testified that defendant assured him of the 5 per cent commission if Johnson bought the property.

According to defendant's testimony, however, plaintiff stated that he was unable to sell the property to Johnson and hoped that defendant could close the sale with him. Plaintiff then asked if defendant would give him ''something for what efforts'' he had put forth.

On October 5, 1943, Johnson and defendant met in Sacramento. They discussed the merits of the property, and defendant stated his price to be $40,000. Johnson replied that the property was worth only $35,000 to him. Defendant offered the property for $38,000 and, when Johnson stood firm, suggested that they split the difference and close the deal at $36,500, subject to the approval of his wife. Johnson refused to commit himself on that figure, and the parties agreed to resume negotiations the following week.

On October 8, 1943, three days after the Sacramento meeting, defendant sent a telegram to the broker terminating his agency: ''. . . my property . . . not for sale at this time through any broker. Have decided to sell direct therefore no commission to any one.'' Shortly thereafter, defendant was persuaded to give another broker a 10-day exclusive agency to sell the property. Defendant meanwhile promised Johnson that a definite answer on the $35,000 offer would be forthcoming in two weeks. The exclusive agency was not fruitful and early in November Johnson purchased defendant's property for $35,000. Plaintiff demanded a commission, but defendant refused to pay it. This action ensued, and the trial court, sitting without a jury, found that the contract was a general contract and that plaintiff had procured a purchaser ready, willing, and able to pay the sale price of $35,000. Plaintiff was therefore adjudged entitled to a 5 per cent commission on the sale.

Defendant appealed from the judgment on the ground that as a matter of law the agreement between the parties was a net contract, calling for a commission to plaintiff only if the sale price exceeded the net figure of $38,000. Plaintiff, on the other hand, takes the position that the agreement constituted a general contract entitling him to a 5 per cent commission on the sale price. Plaintiff also contends that even if the agreement was a net contract, he is entitled to his commission be-

cause defendant terminated the agency and sold the property at a lower figure in bad faith. Since we construe the agreement to be a general contract, it is unnecessary to consider plaintiff's contention regarding bad faith.

■ Ordinarily, the price at which a broker is authorized to sell property is considered merely an asking price to guide the broker in his negotiations with prospective purchasers. (See Rest. Agency, § 447, Comment b.) If the broker procures a purchaser willing to pay a lower price, the owner cannot deprive the broker of his commission by conducting the final negotiations himself and selling at a lower figure to the purchaser procured by the broker. (See 128 A.L.R. 430; 43 A.L.R. 1103.)

■ An owner is entitled, however, to make a special contract with the broker whereby the latter is required to procure a purchaser willing to pay a particular price or meet specific conditions imposed by the owner. In such cases, if the owner sells the property to a purchaser procured by the broker, but on different terms from those stated in the contract, the broker is not entitled to a commission in the absence of bad faith. (*Backman* v. *Guadalupe R. Co.*, 78 Cal.App. 347, 353 [248 P. 296].) ■ In brokers' net contracts, a fixed net amount must be paid to the owner and the broker's compensation is limited to the excess of the payment by the purchaser over the net amount specified. (*Haigler* v. *Donnelly,* 18 Cal.2d 674, 678 [117 P.2d 331].)

In the instant case defendant does not contend that plaintiff was required to furnish a buyer willing to pay $40,000, the price stated in the contract, before he would be entitled to a commission. Nor does defendant regard this agreement as a net contract that would entitle plaintiff to keep all in excess of $38,000. Instead, defendant conceives the agreement to be a type of net contract in which defendant must be assured of $38,000 net to him, but the broker is entitled only to a 5 per cent commission if the property is sold for $40,000 or more.

■ The contract, although ambiguous, does not reasonably lend itself to defendant's construction. Defendant stated: "I have a price of $40,000.00 on the property and if you should arrange the sale, I will pay you 5% commission or a net to me of $38,000.00." If the phrase beginning "or a net to me. . . . ." is excluded, the letter clearly states nothing more than an asking price for the guidance of the broker. The addition of "or a net to me of $38,000.00" is illustrative

of the amount that defendant would receive if the broker sold the property at $40,000. The $38,000 figure has no apparent independent significance, but is merely the amount remaining after the commission is subtracted from the proposed sale price. Interpreted in this manner, the phrase may be explained without doing violence to the remaining language in the contract.

If the contract were construed to require $38,000 net to defendant, the provision for a 5 per cent commission would have little meaning. In such a case, a sale price of between $38,000 and $40,000 would result in less than a 5 per cent commission to the broker. The requirement of a $38,000 net minimum would also subordinate the proposed sale price of $40,000. The $40,000 would no longer be the proposed sale price, but would be transformed into a pivotal amount determining whether the broker should receive a 5 per cent commission or less.

Defendant could have achieved the result he now seeks by using clear language in the letter of April 29th. He failed to do so and now attempts to construct a complicated schedule of commissions purportedly based upon an agreement capable of a more direct and reasonable construction. (Civ. Code, § 1654.)

Moreover, the trial court's interpretation of the contract is supported by the evidence. (See *Estate of Rule*, 25 Cal.2d 1, 11 [152 P.2d 1003, 155 A.L.R. 1319].) There was evidence from which the trial judge could infer that it was not the meaning of the contract that a price of $38,000 net to the owner was a condition precedent to the payment of plaintiff's commission.

Before the commencement of this action defendant consistently took the position that plaintiff had not procured a purchaser for the property. He regards himself and persons in Johnson's home office in San Francisco as the ones who actually procured Johnson as the purchaser. Defendant introduced evidence at the trial to establish this point but the trial court found that plaintiff was the procuring cause of the sale. At no time, however, did defendant inform plaintiff that he would be denied a commission for any reason other than that he had not been able to sell the property.

Defendant's telephone conversation with plaintiff before Johnson went to Sacramento and his subsequent communications with plaintiff are devoid of any reference to the so-called

net price. According to plaintiff, defendant stated over the telephone that "if Mr. Danielson [defendant] sold the property to Mr. Johnson . . . he would pay me a five per cent commission." Defendant contends that even if he is assumed to have made that statement, it is nevertheless consistent with his present position, since he thought that Johnson was willing to pay the asking price of $40,000. Plaintiff's account of this conversation, accepted by the trial court, as stressing the commission percentage rather than the net figure gains strength, however, in the light of defendant's subsequent communications.

On October 8th, defendant sent the telegram to plaintiff attempting to terminate the agency. There again no mention was made of the purported net minimum. Defendant merely stated in the telegram that the property was no longer for sale through any broker and that defendant had decided to sell direct in order to avoid the payment of commissions. Defendant was not obligated to pay a commission, according to his present theory, unless plaintiff procured a purchaser willing to pay more than $38,000. The evidence establishes that the only purchaser then in sight was Johnson, who was willing to pay only $35,000, and defendant was then negotiating with him for the sale of the property. If defendant terminated the agency because plaintiff had failed to procure a purchaser willing to pay the net minimum figure, he could easily have so stated.

After learning of the sale, plaintiff wrote to defendant requesting his 5 per cent commission. Defendant replied by letter and quoted his telegram of October 8th, adding: "The property was listed at various times with several real estate brokerage firms, none of whom were able to move the property. Therefore, no commission to anyone." Thus, even after the sale had been completed at a price lower than the now asserted net figure, defendant was contending that he, not plaintiff, was the procuring cause of the sale and for that reason refused to pay the commission. Had defendant contemplated that the contract called for $38,000 net to him, it is reasonable to believe that he would have added that as a ground for refusing to pay the commission.

The trial court could therefore reasonably conclude that defendant's actions were inconsistent with his contention that he understood the contract to mean that plaintiff was obligated to procure a purchaser willing to pay a minimum net sum.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., and Spence, J., concurred.

SCHAUER, J.—I concur in the judgment on the ground that the evidence is legally sufficient to support all essential findings of the trial court, including its construction of the contract which is the basis of the action. No other question need engage our attention.

Appellant's petition for a rehearing was denied August 28, 1947.